**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **FREDDIE LEE SMITH #2402390** | § | |
| | § | |
| **V.** | § | **A-25-CV-1605-RP** |
| | § | |
| **ERIC GUERRERO** | § | |

**ORDER**

Before the Court are Petitioner's Application for Habeas Corpus under 28 U.S.C. § 2254 (#1), Respondent's Response (#7), and Petitioner's Reply (#10). Petitioner is represented by counsel and has paid the filing fee. For the reasons set forth below, Petitioner's application for writ of habeas corpus is denied.

STATEMENT OF THE CASE

**A. Petitioner's Criminal History**

According to Respondent, the Director has lawful and valid custody of Petitioner pursuant to a conviction in Bastrop County, Texas. SHCR-02 (#8-63) at 18-20. In cause number 16,977, *The State of Texas v. Freddie Lee Smith*, Petitioner was charged by indictment with one count of capital murder. *Id.* at 5-6. Petitioner pled not guilty. *Id*. at 18. On June 30, 2022, the jury found Petitioner guilty of the offense of capital murder, and the trial court sentenced him to life imprisonment without parole. *Id.*

Petitioner's conviction was affirmed on appeal. *Smith v. State*, No. 0322-00411-CR, 2023 WL 5597350 (Tex. App.—Austin, pet. ref'd) (mem. op.). Petitioner filed a Petition for Discretionary Review which was refused by the Texas Court of Criminal Appeals (TCCA) on March 27, 2024. *In re: Smith*, No. PD-0605-23 (Tex. Crim. App. 2024).

Petitioner, through counsel, filed an application for state writ of habeas corpus on March 26, 2025. SHCR-01 (#8-60) at 5. This application was dismissed as non-compliant on May 21, 2025. SHCR-01 (#8-61). Petitioner, again through counsel, filed a second state habeas application on May 23, 2025. SHCR-02 (#8-63) at 29. On September 3, 2025, the TCCA denied the application without written order. SHCR-02 (#8-64). Petitioner filed his federal habeas petition on October 2, 2025. Pet. (#1)

**B. Factual Background**

The Third Court of Appeals summarized the facts as follows:

> Around 2:00 a.m. on February 4, 2015, an officer with the Bastrop Police Department was patrolling businesses in Bastrop, Texas, and drove to the parking lot of a shopping center that had no current tenants. While at the shopping center, the officer noticed a car in the otherwise empty parking lot. When the officer drove closer to the car, he saw the body of a woman that was partially inside the car. The deceased woman was later identified as Dean, a victim-witness counselor for the Kyle Police Department. Dean was twenty-six weeks' pregnant and had been shot in the head three times with .25 caliber bullets. The father of her baby was later identified as Von Trey Clark, an officer with the Austin Police Department. As part of a massive multi-agency investigation lasting for years, Clark, Kevin Watson, and [Petitioner] were all charged with the murder for hire of Dean and her unborn child. Watson elected to plead guilty in exchange for a reduced sentence. As part of the agreement, Watson also agreed to testify at [Petitioner]'s trial.
>
> In his testimony, Watson explained that he and Clark had been friends for years and that they continued to be friends when he decided to sell illegal drugs even though Clark was a police officer. Additionally, Watson testified that he had been friends with [Petitioner] for several years. Watson also related that his common-law wife was Kyla Fisk. Watson lived in Houston, Texas, with Fisk, and [Petitioner] lived in a different area of Houston. Clark lived in Austin, Texas.
>
> Regarding the events leading up to Dean's death, Watson related that Clark was upset that Dean was pregnant with his child and that Dean did not want to have an abortion. Clark

did not want Dean to have the child because he was involved with another woman. Because Dean did not want to have an abortion, Clark decided that he needed to have her killed and asked for Watson's help. To further the plan, Clark asked Watson to buy some burner cellphones. Watson agreed, purchased two burner phones with 405 area codes in October 2014, and gave Clark the phones. Next, Clark asked Watson to put him in contact with [Petitioner] because he wanted to see if [Petitioner] would kill Dean for $5,000. Although [Petitioner] was initially reluctant because Clark was a police officer, he ultimately agreed to participate. Watson testified that he facilitated the calls between Clark and [Petitioner] but that they eventually started talking directly to one another. In his testimony, Watson related that Clark came up with the idea of making the murder appear to have been a drug deal gone wrong. As part of the plan, Clark mailed one of the 405 burner phones to Watson with some money for Watson to purchase another burner phone and to purchase drugs. After Clark tried to call [Petitioner] from one of the 405 phones and after [Petitioner] did not answer, Watson sent from his personal cellphone a text message to [Petitioner] saying that Clark was trying to contact him.

Regarding the day in question, Watson explained that he purchased another burner phone on February 3, 2015, from a Walmart in Stafford, Texas. At trial, Watson agreed that surveillance footage from the Walmart showed him wearing a red hoodie in the store on February 3, 2015. The new phone had a 213 area code. Watson explained that shortly after activating the 213 number, he had to get a new number assigned to that phone because he made a mistake. Additionally, Watson related that after returning home, he left his personal cellphone at his home, took the two burner phones that he had, and drove to pick up [Petitioner] in Fisk's Toyota. However, because [Petitioner]'s contact information was in Watson's personal cellphone, he was unable to call [Petitioner] for directions. Watson then called Fisk from one of the burner phones to ask her to contact [Petitioner] for directions, and Watson said Fisk may have looked in his personal cellphone to find [Petitioner]'s contact information. Once he learned how to get to [Petitioner]'s home, Watson picked up [Petitioner] and headed to meet Clark. Clark called and said he wanted to meet in Bastrop. After getting in the car, [Petitioner] used one of the burner phones to contact his friend Eric about purchasing some marijuana. Watson and [Petitioner] met Eric in a Walmart parking lot west of Houston to make the exchange, and the marijuana was in a white grocery bag. After acquiring the drugs, Watson and [Petitioner] headed to Bastrop.

According to Watson, [Petitioner] had a .25 caliber pistol with him, and [Petitioner] stated that he brought a lower caliber weapon because he thought it would be quieter. When Watson and [Petitioner] arrived in Bastrop, they scoped out some potential meeting locations and decided on a vacant shopping center. Clark said that he would convince Dean to come with him by saying that they were meeting someone to buy a computer tablet. Watson testified that [Petitioner] and he used the burner phones to talk with Clark.

After Watson and [Petitioner] waited for several hours, Clark called from the 405 burner phone in his possession to say that he was on his way. When Clark and Dean arrived, [Petitioner] got out and went over to their car. At that point, Watson drove off and waited for Clark or [Petitioner] to call him and tell him to return. When he received the call, he learned that the gun had jammed and that [Petitioner] told Dean that he had to leave to go get the charger for the tablet as a way to provide an excuse for why he needed to

leave. Watson drove back to the parking lot, and [Petitioner] got in the car. Watson then drove to a gas station while [Petitioner] fixed the gun. They returned to the shopping center, and [Petitioner] got in the backseat of Dean's car as part of the plan to kill Dean. Watson left again and drove in a loop waiting for a call and received a call twenty minutes later telling him to come back.

When Watson arrived, Dean was dead, and Clark walked over to the Toyota, told Watson to move over, sat in the driver's seat, and drove off. Contemporaneously, [Petitioner] got into the driver's seat of Dean's car and drove off. Clark and [Petitioner] drove to a nearby road before pulling over, and the three of them looked for shell casings inside Dean's car. Clark and [Petitioner] were wearing gloves, and Watson put socks on his hands. They found two casings but could not find the third. They drove back to the shopping center to continue the search and took out the backseat of Dean's car to aid in their search. Watson testified that someone moved Dean's body partially out of the car as part of the search. They then placed the bag of marijuana in the car and attempted to collect all of the phones out of Dean's car but inadvertently left one phone behind.

Watson then drove Clark and [Petitioner] toward Austin for a few miles before pulling over to allow [Petitioner] and Clark to change clothes and then place the old clothes and the collected phones, including the burner phones, in a bag that Clark brought with him. The three of them got back into the car, and Watson drove Clark to his car near his house in Austin. When they arrived in Austin, they found the third casing in Clark's pants. Clark gave [Petitioner] a bank envelope with money in it. After dropping off Clark, Watson drove [Petitioner] back to his house in Houston. On the way, Watson called Fisk from one of the burner phones around midnight to tell her that he was coming home. When discussing the incident on the way to Houston, [Petitioner] said that he shot Dean in the head twice, that Clark then asked for the gun because he wanted to shoot her too, and that Clark subsequently shot her. Once they arrived at [Petitioner]'s house, [Petitioner] took the bag of evidence and said that he would dispose of the contents. After dropping [Petitioner] off, Watson headed home.

When Watson arrived home, Fisk told him that [Petitioner] had been calling his personal cellphone. Watson called [Petitioner] back, and [Petitioner] informed him that there was no gun in the bag. Watson then went to look for the gun in the Toyota, but he realized that he had locked the keys inside the car and had to break one of the smaller windows to get inside the car. Watson talked with [Petitioner] on the phone multiple times about his search for the gun. Because he did not find the weapon in the car, he decided that he needed to go back to Bastrop to look for the weapon and picked up [Petitioner] on the way. When they got to Bastrop, they saw police at the shopping center. Watson drove to the area where [Petitioner] and Clark changed clothes, but neither he nor [Petitioner] saw the weapon. Watson and [Petitioner] then headed back to Houston. When they arrived at [Petitioner]'s home, Watson found the gun "wedged ... between the driver's seat and the door" and handed the weapon to [Petitioner] so that he could dispose of it.

In his testimony, Watson explained that he called and texted Clark multiple times to talk about the weapon being unaccounted for but that Clark never answered. A few days later, on February 8, 2015, Clark asked Watson to send a threatening message to one of Dean's

co-workers. To accomplish this, Watson decided to purchase another burner phone. Watson's friend Aaron Williams drove Watson to Walmart to purchase another phone and walked into Walmart with him. Williams then drove Watson to Bastrop. When they reached Bastrop, Watson activated the phone and sent a threatening message to the phone number Clark provided. Clark wanted the message sent from Bastrop to make it appear to authorities that the killer was still there because the police had already questioned Clark about Dean's death. Watson then destroyed the phone.

Regarding later events, Watson explained that the police questioned Williams about his whereabouts on February 8, 2015, and questioned Eric about his communication with one of the 405 burner phones on the day of the offense. Further, Watson testified that he had phone calls with Clark and [Petitioner] discussing the police investigation, the possibility of them all switching phone numbers, and the police interviewing Fisk.

During the trial, Fisk also testified. Fisk explained that Watson was her common-law husband, that Watson was arrested in 2012 for drug charges, and that they were both arrested in 2014 in Fort Bend County for selling drugs. She explained that she pleaded guilty to that charge and was placed on deferred-adjudication community supervision. As part of her plea agreement in the drug case, Fisk agreed to testify in any case involving the death of Dean. Fisk admitted that she was originally charged with tampering with evidence for disposing of the red hoodie Watson was wearing when he went to Walmart, but she stated that the charge was later dismissed. Although she admitted that she disposed of the hoodie, she stated that she had no idea of its significance and had disposed of a lot of Watson's property after having to move out of their home. Further, she denied being a party to or otherwise participating in the case and explained that she had never been charged in this case or entered into any deal in this case. A law-enforcement officer testified that Fisk hid the hoodie and other clothes at a friend's house and could possibly have been a party to the offense but further explained that she would not have been if she did not find out details about the offense until after the crime occurred.

Fisk testified that she had a white Toyota that she allowed Watson to drive, that Watson used burner phones regularly, and that Watson had a personal cellphone that he used. Additionally, Fisk explained that on the night in question, Watson said that he was going to Austin with [Petitioner] and drove her car on the trip. Fisk remembered that Watson left his personal cellphone at their house and then called her from a number that she did not recognize asking for directions to [Petitioner]'s house. Because she did not have [Petitioner]'s number in her phone, she used Watson's phone to call [Petitioner] and was talking on both phones to get the directions from [Petitioner] and relay them to Watson. Next, Fisk related that she received a call from Watson from a 405 number late at night. When Watson returned home that night, he received a call from [Petitioner] and then began looking for the car keys before realizing that the keys were locked inside her car and then breaking a window to gain access. Fisk remembered that Watson then drove off and returned later that day. In addition, Fisk testified that she found [Petitioner]'s jacket in her car after February 4, 2015, and that the jacket had money in it. Although Fisk began to wonder if Watson had been involved in Dean's death after seeing a news story about it, she explained that Watson repeatedly denied being involved before ultimately admitting his complicity. According to Fisk, Watson said that Clark wanted to kill Dean because she was

pregnant and that [Petitioner] shot Dean. A subsequent search of Fisk's car revealed glass inside, and Fisk's phone records showed that she called an automobile glass repair company on February 4, 2015.

Following Fisk's testimony, Eric Unuigboje testified that he had been friends with [Petitioner] for years. Further, Unuigboje admitted that he used to sell marijuana and had sold it to many people. Additionally, he testified that [Petitioner] called him from a 405 number on February 3, 2015, but that he did not remember if he met with [Petitioner] to sell him marijuana. However, although he denied remembering making the statement, he admitted that he told the Texas Rangers that he met [Petitioner] and another person to sell them marijuana. Unuigboje also admitted that after he spoke with the Texas Rangers, he called [Petitioner] and told him that the Texas Rangers had questioned him about a 405 number.

In addition to the above witnesses, the State called law-enforcement officials from multiple agencies to discuss the joint investigation undertaken in this case. One officer testified that after a police officer found Dean, the officer called for backup and that the responding officers learned that the vehicle belonged to Dean and noticed a white bag containing marijuana. Two of the officers later testified that the bag of marijuana seemed to have been placed in the car after the shooting because there was no blood on the bag. The police also found money inside the car, and one of the officers testified that it would be unusual to find money in the car if the death had been the result of a drug deal gone wrong. While searching around the car, the police observed that the backseat had been removed from inside Dean's car and placed outside nearby. The police discovered Dean's personal cellphone in the car and performed a forensic data extraction on the phone to learn whom Dean had been communicating with before her death. During their investigation, the police learned that Dean worked for the Kyle Police Department as a Victims' Services Coordinator and had been dating Clark, who was a police officer for the Austin Police Department and had a common-law wife. DNA testing performed on Dean's baby confirmed that Clark was the father.

The data extracted from Dean's phone showed that Clark had previously sent text messages to Dean pressuring her to have an abortion but that Dean had informed him that she wanted to have the baby. The extraction also revealed that Dean's phone had exchanged calls and texts with a number with no associated contact information in her phone starting at 9:34 p.m. on February 3, 2015. The number was (213) 257-5010 ("first burner phone"), and the first burner had become active that day and had only been used to communicate with two numbers: Dean's phone and another phone with phone number (405) 534-6043 ("second burner phone"). In the time leading up to her death, Dean's phone pinged off a tower near her home in south Austin but began to move after receiving a call from the first burner phone. The phone travelled to William Canon Drive, and surveillance footage from a convenience store on William Cannon Drive showed Dean entering the store at 9:37 p.m. On the footage, Dean was not using her cellphone, but the records for her phone showed that someone was using the phone at the time to talk with the first burner phone. Dean's phone then travelled east toward Bastrop. There were several text exchanges between Dean's phone and the first burner phone in which the user of the first burner phone instructed the other user to get $120 and in which the phone users planned to meet at a

shopping center in Bastrop. Dean's phone sent a message saying that the user “only ha[d] a bill,” and the ATM receipt from the convenience store showed that Dean withdrew $100. Dean's phone travelled to Bastrop and at 10:04 p.m. began pinging off a cell tower near the shopping center where she was later found.

The first burner phone had been purchased at a Walmart in Stafford. The phone had a different number assigned to it when it was first purchased—(213) 257-7689—but the number was changed to the 5010 number an hour after it was first activated. The phone was activated at or near Kuykendahl Road in Houston. Before the phone switched numbers, the 7689 number had been used to call Clark's number multiple times and to call Fisk's phone. All of those calls also occurred on February 3, 2015. After examining Fisk's Facebook account and public records, the police learned that Fisk was romantically involved with Watson and lived with him on Kuykendahl Road in Houston and that Watson and Fisk had previously been arrested for a drug offense in another county. The first burner phone was at or near their address between 11:20 a.m. and 1:34 p.m. on February 3, 2015, and was near the crime scene after 10:00 p.m. That phone had multiple phone calls and text exchanges with Dean's phone between 9:34 p.m. and 10:30 p.m. on February 3, 2015.

Phone records for the second burner phone showed that the phone had made calls to Fisk's phone, to a number listing [Petitioner]'s grandmother as the subscriber, and to (405) 534-6069 (“third burner phone”), which had no registered user. The records for [Petitioner]'s grandmother's account showed that [Petitioner] was an authorized user of that phone and that the phone had contacted the second burner phone, the third burner phone, and Watson's cellphone. The second burner phone made two calls to the number for which [Petitioner] was an authorized user on January 22, 2015, and January 30, 2015, but no one answered. After no one answered, Watson sent a text message to [Petitioner]'s phone stating that Clark was trying to get in touch with [Petitioner] “from a 405 number.” The second burner phone again called [Petitioner]'s number, and someone answered. At that time, the second burner phone and Clark's known phone were pinging off the same cellphone tower.

The records for the second and third burner phones showed that the phones were purchased at a Walmart in Katy, Texas. Until January 30, 2015, both phones were pinging from a tower near Clark's house. Around that time, Clark sent Watson a text message asking for Watson's address, and Watson responded with his Kuykendahl address. The phone records for Clark's phone showed that his phone subsequently pinged off a tower near a post office in Austin, and a receipt from the post office obtained during the investigation showed that Clark sent a package to Watson in Houston on January 30, 2015. The records for the third burner phone established that the phone had been moved to Houston, and the records for the second burner phone showed that the phone was still in Austin. On the night in question, between 7:00 p.m. and 8:30 p.m., the second burner phone was located “at or near” Clark's home in Austin, Texas. The phone then moved to William Cannon Drive before heading east and connecting to a cell tower near the crime scene in Bastrop. That night the second burner phone had multiple interactions with the third burner phone and the first burner phone, including one phone call at 10:43 p.m. near the shopping center. A little after midnight, the second burner phone was in Austin near Clark's home and was used to call Fisk's phone.

The phone records for the third burner phone showed that on the day in question it was in Houston when it communicated with the second burner phone, which was in Austin. The third burner phone then moved to another area in Houston around 3:00 p.m. On the way, the phone made a call to Fisk, and Watson's cellphone was contemporaneously used to contact [Petitioner]. Both Fisk's and Watson's known phones were pinging off a tower near their home. Following the phone call with Fisk, the third burner phone was pinging off a tower near [Petitioner]'s house on Kenilwood Drive. Watson's personal phone stayed connected to the cell tower near his and Fisk's home on February 3, 2015. The third burner phone was near the crime scene between 7:30 p.m. and 10:45 p.m. on the night in question. That phone had contact with only four numbers: the second burner phone, Fisk's phone, Watson's phone, and the number of an individual later determined to be Unuigboje. Around the time of Dean's death, her phone, the third burner phone, the second burner phone, and the first burner phone were all using the same cellphone tower near the shopping center.

In their investigation, the police discovered that Clark's and [Petitioner]'s known phones began exchanging calls and texts on December 18, 2014. On February 2, 2015, Watson's known phone texted Clark's phone to ask, “What time tomorrow”? Clark's phone responded, “We haven't talked it through.” Then Watson's phone replied, “Thought you had the spot. We were just going to show up.” Around the same time, [Petitioner]'s phone called Watson's phone. That same day, Watson's and Clark's phones continued to exchange calls and texts, and Watson's and [Petitioner]'s phones also made calls to one another. On the morning on February 3, 2015, Clark's phone called Watson's phone as Watson's phone was traveling from near his home to a Walmart in Stafford before returning home. After Watson's phone returned to near his home, Watson's phone repeatedly called Clark's phone and [Petitioner]'s phone. [Petitioner]'s known primary phone called the third burner phone a few times but had no more activity from 3:00 p.m. on February 3, 2015, to 3:00 a.m. on February 4, 2015; however, another phone that [Petitioner] owned and used called Unuigboje before the third burner phone began calling Unuigboje and travelling toward Unuigboje's phone. From 3:00 a.m. to 4:30 a.m. on February 4, 2015, [Petitioner]'s phone and Watson's phone had twenty phone calls to one another. Until 4:10 a.m., [Petitioner]'s phone was pinging off a tower near his home, and Watson's phone was pinging off a tower near his home; however, after 4:10 a.m., Watson's phone began travelling toward [Petitioner]'s home, and [Petitioner]'s phone called Watson's phone when Watson's phone was close to [Petitioner]'s home. Hours later, Watson's phone pinged off cellphone towers in a manner indicating that the phone was traveling from Bastrop to Houston. Watson's phone then pinged off a tower near [Petitioner]'s home around 9:30 a.m. before traveling back to Watson and Fisk's home. During the time of the offense and in the weeks leading up to and following the offense, [Petitioner]'s known phone never pinged off a tower outside the Houston area.

On February 8, 2015, a few days after the police found Dean, a friend of hers received a text message threatening to hurt the friend and referencing Dean's death. The police learned that the threat had been sent by a phone purchased at a Walmart in Katy and activated shortly before the threat was sent. An officer with the Austin Police Department drove to the Walmart and obtained a copy of the receipt as well as surveillance footage of the person who purchased the phone. The surveillance footage showed two men entering Walmart, purchasing the phone, walking to a car, and driving off. The license plate number was

visible on the footage, and the police learned that the car was registered to the grandfather of Watson's friend Williams.

The officer who drove to Katy later drove to a Walmart in Stafford to obtain surveillance footage of the person who purchased the first burner phone on February 3, 2015. The footage showed a man in a red hoodie talking on a cellphone the entire time he was in the store, buying another cellphone, walking to a white Toyota, and driving off. The license plate number for the Toyota could be seen on the footage, and the police learned that the car was registered to Fisk. The cellphone records for Watson's cellphone showed that Watson was on his personal cellphone when the person in the red hoodie purchased the new cellphone, and the phone was pinging from a cellphone tower near the Walmart then.

As part of the investigation, the law-enforcement agencies obtained a warrant to do phone intercept monitoring on Clark's phone, Watson's phone, [Petitioner]'s phone, Fisk's phone, and Williams's phone. In one call between [Petitioner] and Watson following the police's interviewing Unuigboje, [Petitioner] and Watson agree that they need to change numbers because Watson called [Petitioner] and Fisk trying to get directions and because the police were questioning Unuigboje about a 405 number. On another call, [Petitioner] said that the cellphone that he was using was connected to the house in which he was living but was not in his name. In another call, [Petitioner] and Watson again discussed whether Watson called him using a 405 number, and [Petitioner] said that Watson never called him from a 405 number because Watson also had a different burner phone in his possession then with a different area code. [Petitioner] and Watson agree that they should be fine because [Petitioner] was right about the phones. During an earlier call, Watson and [Petitioner] discussed Fisk being asked to submit to an interview, and Watson said that he thought [Petitioner] would be interviewed next. Watson expressed that they were both alright, but [Petitioner] stated that he believed people were watching him.

After listening to the intercepted phone calls, the police obtained a warrant to search [Petitioner]'s home on Kenilwood. When the officers arrived, they discovered that [Petitioner] had moved out of the home but left behind personal items in the home. A search of [Petitioner]'s room in his home revealed a receipt from when [Petitioner] purchased the phone that listed his grandmother as the subscriber. The police also discovered a second phone with a different number belonging to [Petitioner]. Records for the secondary line revealed that the phone called Unuigboje's phone 30 minutes before the third burner phone called Unuigboje's phone. A search of [Petitioner]'s Facebook account showed multiple instances in which [Petitioner] stated that his personal phone number was the one associated with his grandmother's account. In his Facebook account, [Petitioner] also indicated that he lived on Kenilwood.

When [Petitioner] was arrested later for a separate offense, he had the phone that listed his grandmother as the subscriber. The phone had pictures of [Petitioner] on the camera roll and his emails. The search of the phone also resulted in the discovery of a 2013 photo of two .25 caliber pistols, and a firearm forensic expert testified that the bullets recovered from Dean's body were all fired from the same weapon and that one of the guns in the photo was the type of pistol that would have produced the rifling pattern found on the recovered bullets.

> Once the State finished calling its witnesses, both sides rested and closed. The jury charge included an instruction that Watson was an accomplice to the alleged offense and that, therefore, [Petitioner] could not be convicted based on Watson's testimony unless the testimony was corroborated. After considering the evidence presented at trial, the jury found [Petitioner] guilty of capital murder.

*Smith*, 2023 WL 5597350 at *1-7; SHCR-02 (8-33) at 1-15.

**C. Petitioner's Grounds for Relief**

Petitioner raises the following grounds for relief:

1. He was denied effective assistance of trial counsel because his trial counsel:

    a. Failed to challenge the testimony of accomplice-witness Kevin Watson;

    b. Failed to challenge the trial court's treatment of Watson's wife, Kyla Fisk, as a non-accomplice witness;

    c. Failed to use phone data in Petitioner's defense; and

    d. Failed to object to the presentation of Von Trey Clark's judicial confession and factual plea, on hearsay and Confrontation Clause grounds.

Pet. (#1) at 6-8; (Ex. #1-1) at 9-17.

DISCUSSION AND ANALYSIS

**A. The Antiterrorism and Effective Death Penalty Act of 1996**

The Supreme Court has summarized the basic principles that have grown out of the Court's many cases interpreting the 1996 Antiterrorism and Effective Death Penalty Act. *See Harrington v. Richter*, 562 U.S. 86, 97–100 (2011). Under § 2254(d), a petitioner may not obtain federal habeas corpus relief on any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown*

*v. Payton*, 544 U.S. 133, 141 (2005). This demanding standard stops just short of imposing a complete bar on federal court re-litigation of claims already rejected in state proceedings. *Harrington*, 562 U.S. at 102 (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)).

One of the issues *Harrington* resolved was "whether § 2254(d) applies when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Id.* Following all of the Courts of Appeals' decisions on this question, *Harrington* concluded that the deference due a state court decision under § 2554(d) "does not require that there be an opinion from the state court explaining the state court's reasoning." *Id.* (citations omitted). The Court noted that it had previously concluded that "a state court need not cite nor even be aware of our cases under § 2254(d)." *Id.* (citing *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)). When there is no explanation with a state court decision, the habeas petitioner's burden is to show there was "no reasonable basis for the state court to deny relief." *Id.*

As *Harrington* noted, § 2254(d) permits the granting of federal habeas relief in only three circumstances: (1) when the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the Supreme Court; (2) when the earlier decision "involved an unreasonable application of" such law; or (3) when the decision "was based on an unreasonable determination of the facts" in light of the record before the state court. *Id.* at 100 (citing 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). The "contrary to" requirement "refers to the holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Dowthitt v. Johnson*, 230 F.3d 733, 740 (5th Cir. 2000) (quotation and citation omitted).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.

*Id.* at 740-41 (quotation and citation omitted). Under the "unreasonable application" clause of § 2254(d)(1), a federal court may grant the writ "if the state court identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 741 (quotation and citation omitted). The provisions of § 2254(d)(2), which allow the granting of federal habeas relief when the state court made an "unreasonable determination of the facts," are limited by the terms of the next section of the statute, § 2254(e). That section states that a federal court must presume state court fact determinations to be correct, though a petitioner can rebut that presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). But absent such a showing, the federal court must give deference to the state court's fact findings. *Id.*

A federal habeas court's inquiry into unreasonableness always should be objective rather than subjective, with a focus on whether the state court's application of clearly established federal law was "objectively unreasonable" and not whether it was incorrect or erroneous. *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (citing *Williams v. Taylor*, 529 U.S. 362, 409 (2000)). Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *Harrington*, 562 U.S. at 102. A petitioner must show that the state court's decision was objectively unreasonable, which is a "substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (citation omitted). As a result, to obtain federal habeas relief on a claim previously adjudicated on the merits in state court, a petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded

disagreement." *Id*. at 103; *see also Bobby v. Dixon*, 565 U.S. 23, 24 (2011). "'If this standard is difficult to meet—and it is—that is because it was meant to be.'" *Mejia v. Davis*, 906 F.3d 307, 314 (5th Cir. 2018) (quoting *Burt v. Titlow*, 571 U.S. 12, 20 (2013)).

**B. Evidentiary Hearing**

Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–
>
> (A) the claim relies on--
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Petitioner has failed to plead any allegations that would entitle him to a hearing. Accordingly, to the extent Petitioner requests an evidentiary hearing his request is denied.

**C. Ineffective Assistance of Counsel**

1. AEDPA Impact

Petitioner states four claims of ineffective assistance of counsel. Petitioner claims that trial counsel was ineffective because counsel failed to challenge the testimony of accomplice-witness Kevin Watson, counsel failed to challenge the trial court's treatment of Watson's wife, Kyla Fisk, as a non-accomplice witness, counsel failed to use phone data in Petitioner's defense, and counsel failed to object to the presentation of Von Trey Clark's judicial confession and factual plea, on hearsay and Confrontation Clause grounds. Petitioner raised these same issues in his state habeas application, and the Court of Criminal Appeals rejected the merits of Petitioner's claims without written order.

As such, AEDPA limits the scope of this Court's review to determining whether the adjudication of Petitioner's claims by the state court either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

2. Standard of Review

The Sixth Amendment to the United States Constitution guarantees citizens the assistance of counsel in defending against criminal prosecutions. U.S. CONST. amend VI. Ineffective assistance of counsel claims are analyzed under the well-settled standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner cannot establish a violation of his Sixth Amendment right to counsel unless he demonstrates (1) counsel's performance was deficient and (2) this deficiency prejudiced the petitioner's defense. *Id.* at 687-88, 690. The Supreme Court has emphasized that "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

When determining whether counsel performed deficiently, courts "must be highly deferential" to counsel's conduct and a petitioner must show that counsel's performance fell beyond the bounds of prevailing objective professional standards. *Strickland,* 466 U.S. at 687-89. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Counsel is "'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Burt*, 571 U.S. at 22 (quoting *Strickland*, 466 U.S.

at 690). To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Under this prong, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693). A habeas petitioner has the burden of proving both prongs of the *Strickland* test. *Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

Ineffective assistance of counsel claims are considered mixed questions of law and fact and are analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010). When the state court has adjudicated the claims on the merits, a federal court must review a petitioner's claims under the "'doubly deferential'" standards of both *Strickland* and § 2254(d). *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)). In such cases, the "pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standard," but whether "the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S at 101.

Factual determinations by a state court are presumed correct absent clear and convincing evidence to the contrary, and a decision adjudicated on the merits in a state court and based on a factual determination may not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The presumption of correctness is especially strong when the trial court and the habeas court are one in the same, as they are in this case. *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000)

3. Failure to Challenge Accomplice-Witness Testimony of Kevin Watson

Petitioner claims that his trial counsel should have challenged what Petitioner claims to be the sole basis of his conviction. Pet. (Ex. #1-1) at 11. Specifically, Petitioner states that he was "convicted solely on the basis of accomplice witness testimony, without additional corroborating evidence." *Id.* Petitioner further claims that "[a] competent attorney clearly would have challenged such a basis of conviction, but in the case at hand, trial counsel willfully ignored injustice, and allowed the State to proceed without mounting a challenge to this unlawful basis." *Id*.

The trial court records reflect that, during closing, Petitioner's trial counsel discussed Watson's testimony. Petitioner's trial counsel stated, "[the state] could not bring this case and charge [Petitioner] with capital murder unless Watson gets up there and testifies." RR (#8-24) at 41-42. Throughout their closing argument, Petitioner's trial counsel argued Watson's testimony lacked credibility. *Id*. at 41-45. Additionally, Petitioner's trial counsel stated during their closing "the only way that you can find [Petitioner] guilty is if you believe Watson." *Id.* at 45.

The Third Court of Appeals summarized the evidence presented at trial which corroborated Watson's testimony. *Smith*, 2023 WL 5597350 at *9; SHCR-02 (#8-33) at 18-20. The evidence included call records from Petitioner's personal cell phone, recorded phone conversations between Petitioner and Watson, and photographic evidence of the weapon used to commit the crime for which Petitioner was convicted. *Id*. The Third Court of Appeals stated the non-accomplice evidence was "sufficient to connect [Petitioner] to the capital murder of Dean." *Id*.

The jury instructions for Petitioner's trial show that an instruction on accomplice witness testimony was given to the jury before they deliberated. SHCR-02 (#8-63) at 12. Specifically, the instruction states "[a] person cannot be convicted of a crime on the uncorroborated testimony of an accomplice," and "Kevin Watson is an accomplice to the crime of Murder, if it was committed

… [Petitioner] therefore cannot be convicted for Capital Murder on the testimony of Kevin Watson unless that testimony is corroborated." *Id*.

Petitioner fails to plead any facts showing that counsel's actions were prejudicial. To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Under this prong, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693). Petitioner fails to meet his burden to show that trial counsel's performance was deficient or that any deficiency prejudiced him. Petitioner provides no evidence that his conviction was based solely on the testimony of Watson, nor does he provide evidence that his trial counsel failed to address or somehow insufficiently addressed the fact that Watson was an accomplice witness. The trial court record reflects that Petitioner's trial counsel, during closing, focused extensively on the credibility of Watson and the fact that Watson's testimony was integral to the state's case against Petitioner. Additionally, any deficiency of Petitioner's trial counsel's handling of Watson's testimony could not have prejudiced him as the trial court record reflects that there was sufficient evidence to find Petitioner guilty absent the accomplice-witness testimony from Watson. The trial court record further reflects that the jurors were instructed on how accomplice-witness testimony should be treated during their deliberations. The jury is presumed to have followed the instruction of the trial court.

Even assuming that counsel could have made different decisions at trial, Petitioner has failed to meet his burden to show not only that counsel failed to meet the *Strickland* standard, but that the state court's application of the *Strickland* standard was unreasonable. *See Richter*, 562 U.S at 101.

4. Failure to Challenge the Characterization of Witness Kyla Fisk as a Non-Accomplice

Petitioner claims that his trial counsel failed to argue or request appropriate instruction that witness Kyla Fisk could be considered an accomplice witness. Pet. (Ex. #1-1) at 12. In support of this claim, Petitioner points to Fisk's involvement in the crime, in particular the fact that Fisk was charged with felony tampering of evidence related to Petitioner's case. *Id*. Petitioner acknowledges that Fisk's tampering with evidence charges were dropped and Fisk testified at Petitioner's trial as a requirement of her deferred adjudication for an unrelated felony charge. *Id*.; *Smith*, 2023 WL 5597350 at *9; SHCR-02 (#8-33) at 22. Petitioner states that if his trial counsel had argued that Fisk could be considered an accomplice witness, it would have compounded "the State's burden under Article 38.14." Pet. (Ex. #1-1) at 12.

Any attempt by Petitioner's trial counsel to argue that Fisk was an accomplice witness would have lacked merit. Counsel is not ineffective for failure to make a meritless argument. *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999). Fisk was charged with tampering with evidence; however, destroying or tampering with evidence of a crime after the crime has been committed does not create accomplice liability. *See Worthen v. State*, 59 S.W.3d 817, 820 (Tex. App.—Austin 2001, no pet.). Additionally, the Third Court of Appeals stated "[b]ased on the record here, the trial court did not err because Fisk was not an accomplice." *Smith* WL 5597350 at *10; SHCR-02 (#8-33) at 22. Any argument by Petitioner's trial counsel that Fisk could have been treated as an accomplice witness would have been meritless. To the extent Petitioner claims his trial counsel should have objected to Fisk's testimony because she was an accomplice-witness, this claim also fails because counsel is not required to make frivolous objections. *Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998). Accordingly, "failure to make a frivolous objection does not

cause counsel's performance to fall below an objective level of reasonableness." *Id*. (citing *Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995)). Even if Petitioner's proposed objection was not frivolous, the state court determined that Fisk was not an accomplice. Petitioner has therefore failed to show how he was prejudiced by the failure to object to Fisk's testimony or argue for an accomplice witness instruction for Fisk. Regarding Petitioner's claim that his trial counsel failed to object or argue that Fisk was an accomplice witness, Petitioner has failed to meet his burden under *Strickland* and failed to show that the state court's application of the *Strickland* standard was unreasonable.

5. Failure to Elicit Testimony of Phone Data

Petitioner states that phone geolocation evidence strongly contradicted Watson's testimony. Pet. (Ex. #1-1) at 12. Petitioner claims that trial counsel "failed to elicit or present expert testimony, or otherwise emphasize to the jury, that phone geolocation evidence strongly contradicted Watson's version of events." *Id*. Petitioner further claims that by not presenting this evidence, counsel failed to pursue the defense that Petitioner's accomplices conspired alone and that "Watson's plea deal incentivized him to implicate Petitioner." *Id*.

The trial court records reflect that Petitioner's personal cell phone was turned off or dead during the commission of the crime for which Petitioner was convicted and, subsequently, there was no phone geolocation data associated with Petitioner's personal cell phone for the relevant time period. RR (#8-19) at 206-208; RR (#8-20) at 21; RR (#8-28) at 10-11. The trial court records also reflect that Petitioner's trial counsel questioned a witness on the geolocation of the Petitioner's personal phone. RR (#8-20) at 13-15. Petitioner's trial counsel elicited testimony that Petitioner's personal phone "never used a tower outside the Houston area for the timeframe of the records." *Id.* at 15.

Petitioner argues that trial counsel failed to call an expert witness to testify about the phone geolocation data. Pet. (Ex. #1-1) at 12. When a petitioner questions counsel's failure to call a witness, counsel's decision is considered to be essentially strategic, and "speculations as to what [uncalled] witnesses would have testified is too uncertain." *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). A petitioner who alleges ineffective assistance of counsel based on counsel's failure to call either a "lay or expert witness" must "name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to the particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citations omitted). "[H]ypothetical or theoretical testimony will not justify the issuance of a writ[.]" *Martin v. McCotter*, 796 F.2d 813, 819 (5th Cir. 1986) (citation and internal quotation omitted).

Petitioner has not presented any evidence that an expert witness would have appeared at trial and testified favorably. "In order for the appellant to demonstrate the requisite Strickland prejudice, the appellant must show not only that this testimony would have been favorable, but also that the witness would have testified at trial." See *Alexander*, 775 F.2d at 602, citing *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981). Petitioner does not name any witness that should have been called, does not demonstrate that any witness would have been available to testify and would have done so, does not set out the content of the proposed witness's testimony, and does not show that the testimony would have been favorable.

Petitioner also claims that his trial counsel failed to emphasize the phone geolocation data. However, the trial court records contradict Petitioner's claim. Petitioner's trial counsel did address Petitioner's phone geolocation data through witness testimony. Petitioner fails to show how his trial counsel's questions regarding Petitioner's phone geolocation data at trial were somehow

deficient. Petitioner also does not show his counsel was deficient in failing to further emphasize Petitioner's personal cellphone geolocation data. Additionally, Petitioner fails to plead any facts showing that, had his trial counsel called an expert or further emphasized the phone geolocation data, there would have been a substantial likelihood of a different result. Petitioner has also failed to meet his burden to show that the state court's application of the *Strickland* standard, as it relates to this claim, was unreasonable.

6. Failure to Object to Exhibit

Petitioner claims that trial counsel failed to object to the presentation of Von Trey Clark's judicial confession and factual plea on the basis of hearsay and the Confrontation Clause. Pet. (Ex. #1-1) at 14-17. Petitioner fails to explain at what point during his trial Clark's judicial confession and factual plea was presented to the jury. Respondent, in their Answer, state that this exhibit was presented at Petitioner's pre-trial bond hearing and was not presented at trial. Resp. Answer (#7) at 16. In his Reply to Respondent's Answer, Petitioner states that his trial counsel's "failure to object at the bond hearing itself was deficient performance." Pet. Reply (#10) at 3. Petitioner claims that Clark's written confession "was made with the expectation that it would be used for prosecutorial purposes." *Id*. at 4. Petitioner further states that he was never given the opportunity to cross-examine Clark on contradictions that existed between Clark's confession and Watson's version of events. *Id*.

The record of the pre-trial bond hearing reflects that the state offered the judicial confession and factual plea as an exhibit. RR (#8-5) at 35. The pre-trial bond hearing record further reflects that Petitioner's counsel objected to the presentation of this exhibit on the grounds of hearsay and the Confrontation Clause. *Id*. at 36. The judge at the pre-trial bond hearing overruled Petitioner's counsel's objections. *Id.* Petitioner claims that his trial counsel failed to make these exact

objections; however, the record is clear that Petitioner's trial counsel made the objections and the court ruled on them.

Petitioner explains that "[b]ond hearings create a record that influences subsequent proceedings, including plea negotiations, trial strategy and jury perception if testimony from those hearings is later incorporated." *Id*. at 3. Petitioner fails to explain how the performance of his trial counsel at his bond hearing influenced any subsequent proceedings, including his trial. Thus, Petitioner has not shown how his trial counsel was deficient in the handling of Clark's judicial confession and factual plea at Petitioner's pre-trial bond hearing. Additionally, trial counsel could not have objected to the presentation of Clark's judicial confession and factual plea at trial because it was not presented as an exhibit. Petitioner has not shown how trial counsel's failure to object to an exhibit that was not presented at trial could have prejudiced him in any way.

Having independently reviewed the entire state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence. Accordingly, the Court is of the opinion that 28 U.S.C. § 2254, as amended by the AEDPA, bars habeas corpus relief on each of Petitioner's claims that he received ineffective assistance of counsel.

## CONCLUSION

Petitioner's application for writ of habeas corpus is denied.

## CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c) (1)(A). Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases,

effective December 1, 2009, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the dismissal or denial of Petitioner's section 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, the Court shall not issue a certificate of appealability.

It is **ORDERED** that Petitioner's application for writ of habeas corpus is **DENIED**.

It is finally **ORDERED** that a certificate of appealability is **DENIED**.

**SIGNED** on August 20, 2026.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE